**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ELIZABETH A. REED,**

   **Plaintiff,**

               **Civil Action 2:16-cv-78**
  **v.**             **Judge James L. Graham**
               **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

   **Defendant.**

## REPORT AND RECOMMENDATION

   Plaintiff, Elizabeth A. Reed, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 20), and the administrative record (ECF No. 9).  For the reasons that follow, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff protectively filed her application for benefits in July 2012, alleging that she has been disabled since June 23, 2008, due to a back injury; diabetes; thyroid disorder; depression; post-traumatic stress disorder ("PTSD"); panic attacks; and carpal tunnel syndrome.  (R. at 168-74, 180-86, 211, 224.)  Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.  Administrative Law Judge Kim L. Bright ("ALJ") held a video hearing on July 16, 2014, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 39-57.)  Aimee Mowery, a vocational expert, also appeared and testified at the hearing.  On August 18, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 14–28.)  On December 10, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-6.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the July 16, 2014, administrative hearing that she has gained some weight in the year prior to the hearing due to her depression.  (R. at 40.)  She lives in a two-story home with her husband.  (R. at 41.)  She has a driver's license and drives about once a week, but sometimes not at all.  (*Id.*)  Plaintiff testified that she injured her back in 2008 moving a patient. (R. at 44.)  She underwent a discectomy and fusion in March 2009, followed by eight weeks of physical therapy.  (R. at 45.)  In May and June 2010, she underwent additional physical therapy and three steroid injections.  (R. at 46.)

2

When asked to describe a typical day, Plaintiff testified that she wakes up with pain in her back. She said her surgery "took the edge off of the pain but I am in extreme pain now." (R. at 46.) She needs assistance to wash her hair because she has a hard time putting her arms over her head. (R. at 47.) She can take a shower, but she has trouble getting in and out of the bathtub. (*Id.*) She can make herself a simple meal. (*Id.*) She spends time reading and watching television, but has difficulty concentrating on these tasks. (R. at 48.) She also testified that she spends three to four hours per day lying down. (R. at 53.) She testified that her mother-in-law cleaned the bathtub, and vacuumed, mopped and swept. (R. at 56.)

Plaintiff takes medication for diabetes, Xanax for anxiety, Effexor, Tenormin for high blood pressure, and she was using over-the-counter pain medication. (R. at 49, 51.)

Plaintiff testified that she cannot work due to chronic pain "from the time I wake up to the time I go to bed. I don't sleep very well. There's times when I don't sleep at all. There's times when I may sleep two or three hours a night." (R. at 51.) She testified that she has difficulty bending and using her hands. She testified that she can sit for 15 minutes. (*Id.*)

**B.    Vocational Expert Testimony**

Aimee Mowery, testified as the vocational expert ("VE") at the administrative hearing. (R. at 58-67.) The VE classified Plaintiff's past relevant work as a home health aide, a medium, semi-skilled position. (R. at 60.) The ALJ proposed a hypothetical regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 60-61.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform her past relevant work. (R. at 61.) The VE also testified the hypothetical individual could perform approximately 11,400 light, unskilled jobs in the economy of the state

3

of Ohio and 312,400 in the national economy, such as a mail clerk, inspector, or hand packager. (R. at 61-62.)

### III.    MEDICAL RECORDS

**A.    Physical Impairments**

**1.    Bureau of Workers' Compensation ("BWC")**

As noted throughout the record, Plaintiff suffered an industrial accident on June 23, 2008, when she was working as a home health aide.  Plaintiff injured herself while attempting to move a patient.  Plaintiff reported feeling a sudden severe pain in her lower back, neck, and shoulders. (R. at 523.)

In October 2011, Howard Pinsky, D.O., performed an independent medical examination ("IME") of Plaintiff on behalf of the BWC.  (R. at 334-36, complete copy at 681-85.)  Plaintiff complained of low back and leg pain and subsequently developed neck and right arm pain.  (R. at 681.)  On examination, Plaintiff exhibited a normal stance and gait, right sided para-cervical tenderness, pain in the lumbosacral region with limited range of motion, and weakness in the left ankle.  (R. at 682-83.)  Dr. Pinsky opined that Plaintiff could only occasionally lift or carry up to 10 pounds, could frequently sit and occasionally stand/or walk.  Dr. Pinsky also opined that Plaintiff could not bend, twist, turn, reach, push, or pull, squat or kneel.  (R. at 685.)  Dr. Pinsky concluded these were temporary restrictions and expected the necessary restrictions would last an additional four months until February 13, 2012.  (*Id.*)  Dr. Pinsky opined Plaintiff had not reached maximum medical improvement for purposes of her workers' compensation claim.  (R. at 684.)

4

On June 7, 2012, Plaintiff underwent another IME with Babatunde Onamusi, M.D. on behalf of the BWC.  (R. at 339-82.)  At the time of this examination, Plaintiff described constant, severe pain in her lower back, noting that she has to be on medication, Ultram all the time.  She reports sleep disruption and inability to get comfortable in any position.  She has a hard time riding in a car.  She reported radiation of pain down into her buttocks and to the left lower extremity with numbness and tingling down the same extremity to the top of her foot.  (R. at 340.)  Dr. Onamusi found a reduced range of motion in the spine accompanied by moderate pain, moderate tenderness in the lumbosacral region, diminished sensation across the dermatomal region of the left lower extremity, and pain and difficulty while squatting.  (R. at 341.)  Dr. Onamusi opined that Plaintiff could only occasionally lift or carry up to 10 pounds, could only occasionally push or pull, stand or walk, and sit.  (R. at 344.)  Dr. Onamusi also opined that Plaintiff could not bend, twist, reach below the knees, squat or kneel.  (*Id.*)  Dr. Onamusi concluded that Plaintiff  had not reached maximum medical improvement and would benefit from additional steroid injections as recommended by her treating physician.  (R. at 343.)

Plaintiff underwent a functional capacity evaluation on July 17, 2012.  (R. at 345-53.) On examination, Plaintiff showed some gait discrepancy but no overt swelling or atrophy.  (R. at 349.)  Strength and range of motion in the neck, trunk, shoulders, and elbows, wrists, hips, knees, and ankles were generally within normal limits.  (R. at 349-50.)  The therapist, Thomas Brodagard, OTR/L, reported that Plaintiff had a panic attack and therefore functioning testing was limited.  Mr. Brodagard felt that Plaintiff may benefit from physical therapy to address her pelvic instability and associated weakness and progress to work conditioning program to

optimize physical abilities to return to work.  (R. at 345.)  He also noted pain management might be indicated.  (R. at 346.)

**2.      Charles DeNunzio, D.O.**

On June 30, 2008, a week following her industrial injury, Plaintiff complained to her primary care practitioner, Dr. DeNunzio, of back pain and left side numbness.  (R. at 404.)  Dr. DeNunzio added Vicodin to Plaintiff's medications and ordered additional testing.  (R. at 405.)  X-rays taken on July 1, 2008, showed mild narrowing of the disc space at L5-S1.  (R. at 421.)  In August 2008, Plaintiff told the doctor that she stopped participating in physical therapy because her "boss" told her to stop.  (R. at 398.)

Dr. DeNunzio's records continue through May 2014.  He treated Plaintiff for complaints of pain and intermittent left leg numbness, left shoulder pain, tingling and burning in her left foot.  (R. at 362-492, 506-40, 546-88.)  His clinical examinations were generally unremarkable, he noted neck pain and neurological issues.  He recommended physical therapy and prescribed medications Ultram and medication for hypertension.  (*Id.*)

An MRI of Plaintiff's lumbar spine taken in December 2008 revealed small disc herniation at L5-S1 causing mild compromise of the neural structure slightly more on the left side.  (R. at 316.)  An MRI of Plaintiff's thoracic spine in March 2009 was normal.  (R. at 313, 417.)  An MRI of the cervical spine showed a small herniated disc at C5-6, with no nerve root compression and a herniation to the left lateral recess with root compression at C6-7.  (R. at 314-15, 418-19.)  Nerve conduction testing on April 5, 2009 of Plaintiff's left upper extremity showed an isolated abnormality suggesting some process affecting the left S-1 nerve fibers but was otherwise normal.  (R. at 307.)  An subsequent MRI of the lumber spine taken on March 9,

2011, revealed a moderate paracentral left L5-S1 disc protrusion with a mild mass effect on the left side.  The remainder of the examination was normal.  (R. at 335.)

### 3. Albert Camma, M.D.

Neurosurgeon Albert Camma, M.D., examined Plaintiff on February 12, 2009, pursuant to her industrial injury.  (R. at 304.)  Plaintiff complained of severe pain, numbness, tingling, and weakness, aggravated by lying down, bending, lifting, and other activity.  (*Id.*)  Plaintiff exhibited decreased flexion of her spine but pointed to her neck when asked where it hurt.  There was tenderness of the left sciatic notch, and a positive straight leg raise on the left that was relieved by flexing the hip and knee.  She had decreased pin sensation on the left side of her body to her neck and decreased vibratory sensation in the left lower extremity to the knee.  Dr. Camma assessed lumbar radiculopathy secondary to a small herniated disc at L5-S1, cervical radiculopathy, and possible cervical and thoracic disc herniation.  (R. at 306.)  He recommended additional x-rays, MRIs, nerve conduction studies, and physical therapy, adding that Plaintiff had not had adequate physical therapy to date.  (R. at 304-06.)

### 4. William Zerick, M.D.

Plaintiff saw Dr. Zerick on referral with complaints of neck and arm pain.  He noted a large herniated disc on the left at C6-7 with compression of the left nerve root.  Dr. Zerick recommended surgical intervention.  On May 7, 2010, Dr. Zerick performed an arthrodesis with discectomy and anterior plate fixation and interbody device fixation at the C6-7 level.  (R. at 682.)  Post-operative wounds healed uneventfully.  Post-operative x-rays were unremarkable, showing appropriate healing.  (R. at 682.)

7

### 5. Janet Brockwell, M.D.

When consultatively examined by Dr. Brockwell on January 8, 2013, she found tenderness in Plaintiff's neck and numbness in her left hand. (R. at 494-95.) Range of motion, muscle strength, and reflexes were generally within normal limits. (R. at 496.) Dr. Brockwell opined that Plaintiff could stand and walk up to 15 minutes at a time, sit up to 30 minutes at a time, and lift and carry up to 10 pounds occasionally and 5 pounds frequently. Plaintiff had no or minimal limitations in her ability to reach; and moderate limitations in her ability to push, pull, bend, and handle. (R. at 497.) According to Dr. Brockwell, Plaintiff would be able to bathe, dress, climb stairs, complete household chores such as laundry, cooking, and shopping, and manage medications and finances. (R. at 498.) Dr. Brockwell concluded that Plaintiff was then unemployable and that the physical limitations she found would last for twelve months or more. (*Id.*)

### 6. State Agency Evaluation

On September 28, 2012, state agency physician, Leon D. Hughes, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. (R. at 70-79.) Dr. Hughes opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten frequently; stand and/or walk six hours in a workday; and sit for about six hours in a workday. (R. at 77.) Dr. Hughes also found that Plaintiff was limited to only frequent pushing and pulling in both her upper and lower extremities due to her lower back pain with radiation and reported history of neck surgery. (*Id.*) According to Dr. Hughes, Plaintiff could frequently climb ramps/stairs, stoop, kneel, crouch or crawl; and never climb ladders, ropes, or scaffolds. (*Id.*) Plaintiff was also found to be limited to overhead reaching. (R. at 78.) Plaintiff should avoid concentrated exposure to hazards

8

such as machinery and heights involving the use of her left lower extremity.  (*Id.*)  Dr. Hughes found Plaintiff partially credible.  (R. at 76.)

State agency physician, Olga V. Pylaeva, M.D., reviewed Plaintiff's records upon reconsideration on February 7, 2013, and affirmed Dr. Hughes's assessment.  (R. at 85-94.)

**B.      Mental Health Evidence**

**1.      Regina McKinney, Psy.D.**

On September 14, 2012, Plaintiff was evaluated for disability purposes by Dr. McKinney. (R. at 354-59.)  Plaintiff reported that she had "full blown panic disorder" that started when she was 25 year old, along with PTSD and depression.  (R. at 355-56.)  She took Xanax, which helped, but had no other mental health treatment.  (R. at 355-56.)  Plaintiff said she worked as a certified nurse assistant in a nursing home for eight years, most recently, working as a home health aide for a year before she was injured moving a patient.  (R. at 356.)  Plaintiff said she enjoyed watching television, reading, and crocheting.  (*Id.*)  On mental status examination, Plaintiff was found to be cooperative, with adequate grooming and hygiene.  (R. at 356.)  She showed some limitations in memory and concentration, but no obvious mood disturbances, indications of anxiety, or loose thoughts.  (R. at 356-57.)  Dr. McKinney diagnosed panic disorder, depressive disorder, and generalized anxiety disorder.  (R. at 358.)  She opined that Plaintiff could converse appropriately and respond directly to questions, but her short-term memory, attention, and concentration skills were not strong, and may deteriorate over extended periods of time, resulting in a slowing of performance.  (*Id.*)  Dr. McKinney also found that increased stress and pressure could also lead to increased depressive symptomology including crying, withdrawal, slowed work performance, and poor frustration tolerance.  (R. at 359.)

### 2. Tri-County Help Center

Plaintiff sought mental health treatment at Tri-County Help Center on November 27, 2012. She reported suffering from anxiety and depression, and childhood abuse. She also reported a loss of privacy since she and her husband lost their home and moved in with her in-laws. (R. at 646.) Plaintiff said she was an avid reader, enjoyed listening to music, and attended church. (R. at 648, 654.) A check mark box was checked indicating that she was unemployed and experiencing financial problems, but she did not want to work. (R. at 649.) Plaintiff reported a history of improvement with counseling, but stopped going following a move. (R. at 655.) On mental status examination, Plaintiff had a depressed, anxious mood, with cooperative behavior and logical thought processes. (R. at 658.) The intake social worker assessed PTSD and recommended individual and couples therapy and increased recreational and social activities. (R. at 656-57.)

Plaintiff was first assessed by psychiatrist, Maura Andronic, M.D. on September 11, 2013. (R. at 620-23.) Plaintiff presented with severe panic attacks multiple times a day, PTSD, and depression. (R. at 620.) On mental status examination, Plaintiff showed average eye contact, average demeanor, and logical thought processes as well as depression, anxiety, anger, and irritability. (R. at 621-22.) Dr. Andronic diagnosed depression and panic attacks based on Plaintiff's pending workers' compensation claim for a cervical injury, and her complaints of severe panic attacks several times a day, PTSD, childhood abuse, and depression. (R. at 622.) Dr. Andronic prescribed Effexor, and recommended that Plaintiff taper down her usage of Xanax. (R. at 623.)

On October 7, 2013, Dr. Andronic found Plaintiff would have moderate limitations in accepting instructions and working in coordination with others, completing normal work tasks at a consistent pace, responding appropriately to changes, and tolerating customary work pressures. (R. at 541-44.)  Dr. Andronic also opined that Plaintiff would be markedly limited in relating to the general public and performing at expected production levels.  (R. at 541-42.)  Dr. Andronic further opined that Plaintiff would likely have partial or full day unscheduled absences from work occurring 5 or more days per month due to the diagnosed conditions and/or side effects of medication.  Dr. Andronic concluded that Plaintiff's condition likely to deteriorate if he or she is placed under stress, particularly the stress of an 8 hour per day, 5 day per week job.  (R. at 543.)

The record shows Plaintiff continued to treat with a counselor or with Dr. Andronic for counseling and medication management through at least May 2014.  (R. at 616-19, 644-79.)

### 3.    Weinstein & Associates - Lee Roach, Ph.D. and John Heilmeier, L.I.S.W.

Plaintiff was provided mental health counseling through the BWC with Dr. Roach and licensed social worker, John Heilmeier, L.I.S.W. at Weinstein & Associates, Inc. which is "a large multidisciplinary mental health practice organized to provide comprehensive psychological services (assessment, consultation, and treatment)."  Weinstein & Associates, Inc., http://www.weinsteinandassociates.com (last visited Feb. 20, 2017).

Plaintiff initially saw Dr. Roach for a psychological evaluation on September 5, 2013 to determine whether an additional allowance should be made to her workers' compensation claim. (R. at 608-14.)  Dr. Roach found Plaintiff to be friendly, fully cooperative, and well-groomed. (R. at 608.)  Plaintiff complained of constant physical pain in her back and neck and weakness in her left leg.  (R. at 609.)  As to her emotional status, Plaintiff reported that she had been stressed

and depressed.  (*Id.*)  She reported several medical therapies for four years, including

chiropractic, steroid injections, and physical therapy, but stated that "suddenly" her treatments

were denied, resulting in increased pain and depression.  (R. at 611.)  On mental status

examination, Plaintiff was alert, with no loss of awareness, although she endorsed some memory

and concentration deficits.  (R. at 612.)  Assessment on a depression inventory indicated severe

depression, although Dr. Roach noted that this was exacerbated by physical pain.  (*Id.*)  Dr.

Roach assessed a dysthymic disorder, as a direct and proximate consequence of the 2008 work

injury.  The dysthymic disorder "alone cause[s] sadness with tears, suicidal ideation without

intent, agitation, irritable mood, indecisiveness, reduced concentration, and insomnia symptoms

which preclude her returning to work as a home health aide at this time.  She could benefit from

undergoing psychotherapy and a psychiatric evaluation to assess her psychotropic medication

needs."  (R. at 614.)

　　　When initially seen by Mr. Heilmeier on November 2, 2013, Plaintiff reported symptoms

consistent with panic disorder with agoraphobia.  She also reported symptoms a severe anxiety

which precludes her from leaving the house.  Chronic pain is also an issue in terms of her ability

to function.  Mr. Heilmeier opined that Plaintiff has "significant functional limitations which

keeps her from working."  (R. at 640-41.)  At that time, Mr. Heilmeier opined that Plaintiff had

moderate restriction of activities of daily living; moderate limitation of social functioning;

marked limitation of concentration, persistence and pace; and marked limitation of adaptation.

(R. at 593.)

　　　On March 7, 2014, Dr. Roach opined on a BWC Physician's Report of Work Ability

form that Plaintiff was moderately impaired in her activities of daily living and markedly

impaired in her ability to engage in social functioning; maintain concentration, persistence, and pace; and in adaptation. (R. at 596.) He indicated that Plaintiff had not reached maximum medical improvement with regard to her depression. (*Id*.)

In April 2014, Mr. Heilmeier opined that Plaintiff was mildly impaired in her activities of daily living and markedly limited in her ability to engage in social functioning; maintain concentration, persistence, and pace; and in adaptation. (R. at 591.)

Plaintiff continued to treat with Dr. Roach and Mr. Heilmeier through at least May 2014. (R. at 589-614, 624-41.) During their sessions, Plaintiff discussed depression, difficulty concentration, poor self-esteem, anxiety, and a sense of hopeless. (*Id.*)

### 4. Kathryn Bobbitt, Ph.D.

On January 16, 2013, Plaintiff was evaluated by consultative examiner, Dr. Bobbitt on behalf of the Ohio Department of Job & Family Services. (R. at 500-05.) Plaintiff reported that she was unable to work due to panic disorder, reporting a panic attack earlier that day due to bad weather. (R. at 502.) Plaintiff said she was afraid to drive, but she loved to read, crochet, knit, play cards, and garden. (R. at 504.) Dr. Bobbitt observed that Plaintiff was an effective communicator, logical, conversant, and good-natured, with a good understanding of limitations and seemingly authentic desire to overcome fears. (R. at 505.) Dr. Bobbitt opined that Plaintiff had moderate limitations in her ability to understand, remember, and carry out detailed instructions; accept instructions and get along with coworkers; and maintain attention and concentration for extended periods. (R. at 500.) Dr. Bobbitt also believed Plaintiff was markedly limited in performing activities within a work schedule, completing a normal work day or week, and traveling in unfamiliar places. (*Id*.) Dr. Bobbitt concluded that Plaintiff was

13

employable, but she would require would require mental health intervention to be successful. (*Id.*)

### 5. State Agency Evaluations

On September 24, 2012, after review of Plaintiff's medical record, Bruce Goldsmith, Ph.D., a state agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace; with no episodes of decompensation of an extended duration.  (R. at 75.)  He further determined that the evidence did not establish the presence of the "C" criteria.  (*Id.*)  Dr. Goldsmith gave great weight to Dr. McKinney's opinion finding it based on medically acceptable clinical and diagnostic techniques.  (R. at 76.)

In completing the MRFC,[1] Dr. Goldsmith opined that Plaintiff was moderately limited in her abilities to understand and remember and carry out detailed instructions; to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting.  (R. at 79-80.)

On February 7, 2013, Tonnie Hoyle, Psy.D. reviewed the record upon reconsideration and affirmed Dr. Goldsmith's assessment.  (R. at 85-96.)

---

[1]"MRFC" is a residual functional capacity which limits its consideration to mental capabilities.

14

**C.**     **Evidence Submitted Pursuant to Sentence Six Remand**

Plaintiff was evaluated by Nicolaas Dubbeling, Ph.D., on behalf of the BWC on August 22, 2014.  (R. 686-91.)  Dr. Dubbeling found Plaintiff was oriented, with intact memory and judgment, and normal speech and thought processes.  (R. at 688-89.)   Dr. Dubbeling noted that Plaintiff became increasing outgoing during the interview.  (R. at 687.)  She did not display any symptoms of anxiety.  (R. at 688.)  Plaintiff endorsed a lifelong history of depression and poor concentration, although she also mentioned that she enjoyed school.  (R. at 688.)  She had taken Effexor for nine months, which she indicated helped.  (R. at 689.)  Plaintiff alleged physical limitations due to her injuries, such as difficulty washing her hair and dressing.  (*Id.*)  Dr. Dubbeling opined that Plaintiff had not reached maximum improvement and may need more than 14 therapy sessions over the next 6 months.  (*Id.*)  Dr. Dubbeling stated that due to the severity of Plaintiff's depression, she was unable to return to her former position, and "in a general sense, her psychological condition precludes her from any competitive employment." (R. at 690.)

15

# IV.    ADMINISTRATIVE DECISION

On August 18, 2014, the ALJ issued her decision.  (R. at 14–28.)  The ALJ found that

Plaintiff last met the insured status requirements of the Social Security Act through December 1,

2015.  (R. at 16.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff

had not engaged in substantially gainful employment since June 23, 2008, the alleged onset date.

(*Id.*)  The ALJ found that Plaintiff had the severe impairments of degenerative disc disease,

lumbar radiculopathy, cervical radiculopathy, depression, general anxiety disorder, and panic

disorder without agoraphobia.  (*Id.*)  She further found that Plaintiff did not have an impairment

or combination of impairments that met or medically equaled one of the listed impairments

described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.)  At step four of the

sequential process, the ALJ set forth Plaintiff's RFC as follows:

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

16

> After careful consideration of the entire record, the [ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently push and pull with the bilateral upper extremities and lower extremities; frequently climb ramps and stairs, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; and frequently reach overhead with the bilateral upper extremities. She should avoid concentrated exposure to workplace hazards, including operation of hazardous machinery. She retains the ability to understand, remember and carry out simple, routine, repetitive tasks consistent with unskilled work in an environment without demand for fast pace with infrequent superficial interaction with the general public and appropriate interactions with supervisors and coworkers in a setting where change is infrequent and easily explained.

(R. at 18-19.)  In reaching her conclusions regarding Plaintiff's RFC, the ALJ accorded great weight to the opinions of the state agency consultants, Dr. Hughes and Dr. Pylaeva, finding their opinions are generally consistent with the medical evidence, which shows treatment for back and neck injuries after an accident at work with improvement of her injuries over time; they are familiar with the evidentiary requirements for making disability determinations under the Social Security Act; and the record does not contain a medical opinion from a treating source that further limits Plaintiff's work-related activities.  (R. at 23-24.)

The ALJ accorded little weight to Dr. Pinsky's October 2011 opinion, because Plaintiff had not yet reached maximum medical improvement and the restrictions he imposed were temporary.  (R. at 24.)  The ALJ accorded little weight to Dr. Onamusi's June 2012 opinion, because the limitations therein were not supported by medical evidence.  (*Id.*)  The ALJ accorded some weight to the opinion of Dr. Brockwell, first noting that her statement that Plaintiff was "unemployable" is not a medical opinion, but rather, an issue reserved for the Commissioner, and finding the remainder of her opinion supported by the longitudinal medical records.  (R. at 25.)

17

As to Plaintiff's MRFC, the ALJ gave "great weight" to the opinions of state agency psychological consultants, Dr. Goldsmith and Dr. Hoyle, noting that these psychologists were experts and familiar with the Social Security disability standards, and their opinions were consistent with the medical evidence of record.  (R. at 24.)  The ALJ gave "some weight" to Dr. Andronic's opinion, discounting it because it was not supported by treatment records, which showed improvement, and because it was based on Plaintiff's subjective representation.  (R. at 26.)  The ALJ accorded partial weight to the opinion of Dr. McKinney, noting her opinion finds some support in the findings at the consultative examination, but her opinion is not supported by the longitudinal records regarding Plaintiff's mental health, as the record shows improvement of Plaintiff's mental health symptoms with treatment.  (R. at 25.)  The ALJ accorded some weight to Dr. Bobbitt's and Dr. Roach's opinions regarding Plaintiff's marked limitations finding it not supported by Plaintiff's mental health treatment records, which show improvement with treatment.  (R. 25-26.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy.  (R. at 27-28.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 28.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

In her Statement of Errors, Plaintiff first asserts that the ALJ erred in giving greater weight to the opinions of state agency reviewers than to the numerous opinions from examining sources, without sufficient justification.  (ECF No. 12 at 8).  Plaintiff next argues that the MRFC is not supported by substantial evidence, because the ALJ failed to recognize Dr. Roach as a treating psychologist and failed to provide adequate reasons for rejecting opinions of Drs. Roach

and Andronic.  (*Id.* at 13).  Plaintiff also requests that this case be remanded under sentence six

of 42 U.S.C. § 405(g).  (*Id.* at 22).  The Court discusses each of these contentions of error in turn.

## A.  Opinion Evidence – Physical RFC

Plaintiff first contends that the ALJ erred by giving greater weight to the state agency

reviewers' opinions than the opinions from examining sources.  As a consequence, according to

Plaintiff, the ALJ's RFC is not supported by substantial evidence.  A review of the record

reveals, however, that the ALJ articulated appropriate reasons for giving greater weight to

opinions of the state agency physicians, who have extensive expertise in the Social Security

disability process and who reviewed Plaintiff's subjective statements and longitudinal treatment

records, rather than the opinions of one-time physicians who examined Plaintiff pursuant to her

workers' compensation claim.

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case.  20 C.F.R. § 416.927(c); *see also* SSR 96–8p 1996 WL 374184, at *7 (July 2,

1996) ("The RFC assessment must always consider and address medical source opinions.").  The

applicable regulations define medical opinions as "statements from physicians and psychologists

or other acceptable medical sources that reflect judgments about the nature and severity of your

impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite

impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must

apply the factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment

relationship, supportability of the opinion, consistency of the opinion with the record as a whole,

and the specialization of the source.  In addition, the regulations provide that where the ALJ does

20

not assign controlling weight to the claimant's treating physician, he or she must explain the

weight assigned to the opinions of the medical sources:

> Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 C.F.R. § 416.927(e)(2)(ii).  Where an ALJ's opinion satisfies the goal of § 416.927 and is

otherwise supported by substantial evidence, the failure to explicitly provide the weight assigned

is harmless.  *See, e.g., Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 839 (6th Cir. 2005)

(harmless error where the ALJ failed to mention or weigh the report of consultative neurologist

who only evaluated plaintiff once and was not a treating source).  Ultimately, however, the ALJ

is vested with the discretion to determine the weight that each opinion is due.  *See Justice v.*

*Comm'r of Soc. Sec.*, 515 F. App'x 583, 588 (6th Cir. 2013) (noting ALJ is charged with

evaluating experts' findings and reaching reasoned determination as to claimant's disability

status).

The ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.  The ALJ

did not err in evaluating the opinion evidence.  As the ALJ properly noted, Plaintiff's treating

physicians provided no opinions supporting functional limitations.   Indeed, Plaintiff's treating

physician, Dr. DeNunzio, did not impose any permanent functional restrictions on Plaintiff.   His

findings on physical examination were consistently unremarkable and treatment

recommendations were conservative.  (R. at 370-87, 425-35, 452, 465-83, 559, 582).  *See Rudd*

*v. Comm'r of Soc. Sec.*, 531 F. App'x, 719, 727 (6th Cir. 2013) (minimal or lack of treatment is valid reason to discount severity).

Given the absence of any treating physician opinions, the ALJ gave "great weight" to the opinions of state agency medical consultants, Dr. Hughes and Dr. Pylaeva, in assessing Plaintiff's RFC. These doctors reviewed the evidence of record and opined that Plaintiff could perform work at the light exertional level. (R. at 70-79, 85-94.) Both doctors observed that Plaintiff's allegations were not substantiated by the objective medical evidence and her activities of daily living were not consistent with disabling limitations. The ALJ appropriately accorded these opinions great weight because they were generally consistent with medical evidence, which showed improvement for back and neck injuries with treatment .

Plaintiff points to the reports from several physicians who examined Plaintiff pursuant to her workers' compensation claim. The ALJ explained with good reasons why she accorded these opinions less weight. The ALJ assigned little weight to Dr. Pinsky's opinion of October 2011 because Plaintiff had not yet reached maximum medical improvement and the restrictions were temporary. (R. at. 24, 681-85.) Plaintiff maintain that the ALJ erred in rejecting Dr. Pinsky's opinion for this reason, asserting that Plaintiffs improvement was only temporary. Contrary to Plaintiff's assertion, Plaintiff consistently reported improvement with treatment, particularly steroid injections and chiropractic treatment . (R. at 336, 340, 424, 428, 430-31, 533, 535, 627, 635, 659, 663). She complained because workers' compensation declined to continue financing the treatment she claimed was highly effective, not because treatment was unhelpful. (R. at 609-11, 627, 635.)

22

The ALJ also gave little weight to Dr. Onamusi's opinion of June 2012, because the limitations he imposed were not supported by medical evidence.  *See* 20 C.F.R. § 416.927(c) (ALJ must review examining and treatment relationship, supportability of the opinion,  and consistency of the opinion with the record as a whole).  The ALJ accorded some weight to the opinion of Dr. Brockwell.  She first properly noted that her statement that Plaintiff was "unemployable" is not a medical opinion, but rather, an issue reserved for the Commissioner.  20 C.F.R. § 404.1527(d).  As the Court of Appeals for the Sixth Circuit has held, when a treating physician submits an opinion on an issue reserved to the Commissioner, the opinion is "not entitled to any particular weight," and the ALJ "need only explain the consideration" it was given.  *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013) (unpublished) (internal quotation marks omitted).  The ALJ discounted the remainder of Dr. Brockwell's opinion to the extent it was inconsistent with the RFC because it was not supported by the longitudinal treatment records.

Plaintiff argues that the ALJ neglected to present any evidence or cite to any findings with regard to her conclusion that Dr. Brockwell's opinions were not supported by the longitudinal medical records.  The Undersigned disagrees and finds that ALJ conclusions are supported by substantial evidence.  The ALJ cited a number of specific findings in the record that were inconsistent with Dr. Brockwell's limitations, including Dr. DeNunzio's findings on physical examination that showed completely normal muscle strength, tone, coordination, and range of motion (R. at 468-69, 579); notes that Plaintiff's pain improved with epidural steroid injections (R. at 430); Dr. Zerick's comment that Plaintiff was doing "markedly better" after an epidural steroid injection (R. at 338); Plaintiff's statements that she felt stronger and experienced

23

less pain after physical therapy and felt "like a new human being" after neck surgery (R. at 450, 458); and the chiropractor's reports that Plaintiff showed "very noticeable improvement" after chiropractic adjustment. (R. at 535). Plaintiff further faults the ALJ for purportedly failing to explain how Dr. Brockwell's opinions support the RFC, contrary to the requirement for a "logical bridge" between the evidence of record and her RFC determination. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). The RFC is based on all of the evidence of record, not just the medical opinions. The regulations do not require and ALJ to explain how one doctor's opinion supports the RFC. This is particularly so where, as here, the ALJ assigned Dr. Brockwell's opinion only partial weight.

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).   Thus, an ALJ is not required to produce a detailed statement linking each element in the RFC to the specific evidence supporting it.

Plaintiff contends that the ALJ's reliance on the opinions of the state agency physicians violates Social Security rules and regulations because the state agency examiners did not have access to the medical opinions of Drs. Pinsky, Onamusi, and Brockwell.  Plaintiff then speculates that, had these physicians seen these opinions, "there is little question their opinions would have been altered."  (Pl's Stmt of Errors at 12.)  This supposition, however, does not bear out in the record.  Drs. Hughes and Pylaeva had access to treatment records through July 2012, psychological consultative examination reports from September 2012, and Plaintiff's representations to the Commissioner in Disability and Function reports.  Importantly, the opinions of Dr. Pinsky, Onamusi, and Brockwell were offered for the purposes of determining whether Plaintiff had reached maximum medical improvement and whether additional treatment under the workers' compensation claim was warranted.  Their opinions were never designed to assess whether Plaintiff could perform any work in the national economy or was disabled under Social Security regulations.  Plaintiff provides no support for the assertion that the state agency physicians, Drs. Hughes and Pylaeva, would have altered their opinions based on these one-time workers' compensation evaluations.

It is therefore **RECOMMENDED** that this Statement of Error be **OVERRULED**.

A.  **Weighing Opinion Evidence – Mental RFC (MRFC)**

Plaintiff next contends that the MRFC is not supported by substantial evidence. Specifically, Plaintiff asserts that the MRFC is not supported by substantial evidence because the

ALJ did not recognize Dr. Roach as a treating psychologist (whom the ALJ characterized as an examining psychologist) and failed to provide adequate reasons for rejecting opinions of Drs. Roach and Andronic.   The Undersigned disagrees.

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2). If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

26

opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).

Plaintiff argues that the ALJ erred in failing to recognize Dr. Roach as a treating source, and, therefore, failed to consider whether Dr. Roach's opinion warranted controlling weight.  To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.   The Court must determine whether or not an ongoing treatment relationship exists at the time the physician's opinion is rendered.  *Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 167 F. App'x 496, 506 (6th Cir. Feb. 9, 2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*.  [V]isits to [the physician] *after* his RFC assessment could not retroactively render him a treating physician at the time of the assessment."); *see also Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimaint's] condition.").  This is because "the rationale of the treating physician doctrine simply does not apply" where a physician issues an opinion after a single examination.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

In the instant case, Dr. Roach first evaluated Plaintiff on September 5, 2013, and issued an opinion that same day.  (R. at 608-12.)  After this initial interview, Plaintiff had three counseling sessions with social worker Mr. Heilmeier from Weinstein & Associates, where Dr. Roach is also employed.  Dr. Roach provided a second opinion on March 7, 2014, after his second meeting with Plaintiff, indicating that Plaintiff would begin psychotherapy after her treatment was approved by the BWC.  (R. at 596-97.)  These two examinations simply did not give Dr. Roach a long-term overview of Plaintiff's mental condition. *Yamin*, 67 F. App'x at 885.

Plaintiff maintains that the Commissioner fails to recognize the type of treatment that was being provided in this case. She suggests that the three sessions she attended with the social worker in the practice of Weinstein & Associates "were certainly accessible to and reviewed by the treating psychologist, Dr. Roach, prior to the formulation of his opinions." (Pl's Reply, at p.4.) That very likely is true, but the record contains no evidence of it. While recognizing the benefits of multidisciplinary mental-health practices in providing important treatment, the Court declines the invitation to extend the treating physician rule under the circumstances presented here. To do so would elevate the opinions of the social worker, with whom Plaintiff had only three appointments at the time of Dr. Roach's second report, to treating physician status, which the regulations prohibit. *See* 20 C.F.R. § 404.1513(d) (counselors and social welfare workers not considered acceptable medical sources but are "other sources").

Plaintiff also contends that the ALJ failed to articulate good reasons for rejecting the opinions of Dr. Andronic. As noted above, the ALJ gave "some weight" to Dr. Andronic's opinion but discounted it because it was not supported by treatment records, which showed improvement, and because it was based on Plaintiff's subjective representations. Plaintiff takes issue with the ALJ's assessment that she improved over time and maintains this conclusion is not supported by the ALJ's citations to the record. The Undersigned disagrees and concludes that substantial evidence supports the ALJ's determinations.

The ALJ discounted Dr. Andronic's opinion as follows:

> Dr. Andronic also opined that [Plaintiff] has marked limitation to the abilities to relate to the general public and maintain socially appropriate behavior; and to perform at production levels expected by most employers. . . . Dr. Andronic opined that [Plaintiff] would likely have partial or full day unscheduled absences from work five or more days per month due to her impairments . . . . Dr.

28

> Andronic's opinion regarding [Plaintiff] marked limitations is not supported by [Plaintiff's] mental health treatment records, which show improvement with treatment. . . . Thus, only some weight is given to this opinion.

(R. at 26.)

The ALJ provided good reasons for discounting the opinion of Plaintiff's treating psychologist as being not supported by treatment records which show improvement with treatment.  Plaintiff first treated with Dr. Andronic in September 2013.  At that time, she reported panic attacks multiple times every day.  (R. at 620-23.)  By February 2014, Plaintiff reported improvement, despite not being compliant with Effexor.  (R. at 618-20.)  In May 2014, Plaintiff told Dr. Andronic that Effexor helped "a lot" and she no longer had panic attacks.  (R. at 616.)  Moreover, Plaintiff's therapists consistently noted improvement with therapy.  (R. 590-91, 604, 606, 631, 639.)  This substantial evidence is consistent with and supports the ALJ's finding of improvement.

Plaintiff also challenges the ALJ's finding that Dr. Andronic's opinions were based on Plaintiff's subjective complaints as "nothing more than speculation."  (Pl's Stmt of Errors, at p. 20.)  The ALJ actually said that Dr. Andronic had noted that her opinion regarding Plaintiff's likely deterioration if placed under stress was based upon the Plaintiff's statement that she would have panic attacks if put under stress.  And the record bears out this assertion.  Dr. Andronic acknowledged that her opinion with respect to Plaintiff's response to stress, particularly if she returned to work, was based on Plaintiff's representations.  (R. at 544 ("Per Client").)

The ALJ found that Plaintiff had moderate difficulties in social functioning and concentration, persistence, or pace, and properly accounted for these limiattions in the RFC.  The ALJ explained how the medical evidence and other evidence of record supported these findings.

29

*Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion.")  The ALJ did not commit reversible error in how she weighed the medical evidence  In sum, the ALJ's MRFC assessment is supported by substantial evidence.  It is therefore **RECOMMENDED** that this Statement of Error be **OVERRULED**.

   B. **Sentence Six Remand**

      Plaintiff maintains that a sentence six remand is appropriate to consider the evaluation of Dr. Dubbeling dated August 22, 2014, four days after the ALJ's decision.  Dr. Dubbeling evaluated Plaintiff for purposes of determining whether she had reached maximum medical improvement for her allowed condition of dysthymic disorder.  The Undersigned concludes that Dr. Dubbeling's opinion does not provide a basis for a sentence-six remand.

      Sentence six of 42 U.S.C. § 405(g) provides in relevant part as follows:

> The Court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42. U.S.C. § 405(g).  "Sentence-six remands may be ordered in only two situations: where the Secretary requests a remand before answering the complaint, or where new, material evidence is adduced that was for good cause not presented before the agency."  *Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993) (citations omitted).  The requirements that the evidence be "new" and

"material," and that "good cause" be shown for the failure to present the evidence to the ALJ have been defined by the United States Court of Appeals for the Sixth Circuit as follows:

> "For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' . . . Such evidence is 'material' only if there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.' . . . A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ . . . . [T]he burden of showing that a remand is appropriate is on the claimant."

*Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Plaintiff maintains that the record contains "new and material evidence" in the form of Dr. Dubbelins's opinion that was not submitted during administrative proceedings. The parties agree that the material is new. They disagree, however, as to whether it is material. Plaintiff contends that there is a reasonable probability that the ALJ would have reached a different conclusion had Dr. Dubbeling's opinion been in the record because it "directly refutes the ALJ's mistaken belief that [Plaintiff's] condition improved." (Pl's Stmt of Errors, at p. 23.) Plaintiff suggests that that Dr. Dubbeling's comment that the therapy notes from her sessions with Dr. Roach and Mr. Heilmeier "do not indicate significant improvement of her Dysthymic Disorder" (R. at 689), would have changed the outcome of this case.

Dr. Dubbeling's evaluation in fact bolsters the ALJ's determination that Plaintiff improved with treatment and medication. Plaintiff once complained of daily panic attacks. She reported only two panic attacks to Dr. Dubbeling, one in 2007 and another in 2013. (R. at 688.) Plaintiff reported improvement on Effexor, which she had been taking for nine months at the

time of the assessment. (R. at 689.) Dr. Dubbeling opined that Plaintiff has not reached

maximum improvement for her dysthymic disorder and could need more than 14 therapy

sessions over the 6 months to achieve it. (*Id.*) That he mentions her treatment notes from Dr.

Roach and Mr. Heilmeier "do not indicate significant improvement" fails to subtract from the

substantial evidence upon which the ALJ relied in making her determination of Plaintiff's

MRFC. Plaintiff has failed to demonstrate that the evidence for which she seeks a sentence-six

remand is material.

## VII.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **OVERRULE**

Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## VIII.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex*

*Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  February 21, 2017                            /s/ *Elizabeth A. Preston Deavers*
                                                    Elizabeth A. Preston Deavers
                                                    Chief United States Magistrate Judge

33